2023 IL App (1st) 200663-UB

FIFTH DIVISION
November 9, 2023

No. 1-20-0663

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 3039 01 |
| | ) | |
| JESUS VEGA, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Tailor concurred in the judgment.

**O R D E R**

¶ 1    *Held*: We affirm the circuit court's denial of defendant's motion for leave to file a successive postconviction petition because, pursuant to the Illinois Supreme Court's decision in *People v. Moore*, 2023 IL 126461, defendant cannot show cause for failing to raise his proportionate penalties sentencing challenge in his first postconviction petition.

¶ 2    This case is before us for a second time pursuant to a supervisory order of our supreme court. Following a jury trial in 2006, Jesus Vega was convicted of first-degree murder and sentenced to 75 years in prison. In 2019, Mr. Vega filed a motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2018)), asserting that as applied to him, his lengthy sentence, imposed for an offense committed when he was just 19 years old, violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because "his sentencer failed to take into account the hallmark features of youth now required by the U.S. Supreme and Illinois Courts," referring to *Miller v. Alabama*, 567 U.S. 460 (2012) and its Illinois progeny. The circuit court denied his motion, concluding he failed to satisfy the cause and prejudice test, a prerequisite for the filing of successive postconviction petitions in non-innocence cases, and Mr. Vega appealed that denial.

¶ 3    On March 18, 2022, we issued a decision reversing and remanding Mr. Vega's case for second-stage proceedings under the Act, finding that Mr. Vega had shown both cause and prejudice. *People v. Vega*, 2022 IL App (1st) 200663-U, ¶ 55. Justice Pierce dissented, finding that neither cause nor prejudice had been shown. *Id.* ¶ 69 (Pierce, J., dissenting).

¶ 4    The State filed a petition for leave to appeal that decision to the Illinois Supreme Court. On September 27, 2023, the supreme court denied the petition and issued a supervisory order directing us to vacate our initial order and "consider the effect of [its] opinion in *People v. Moore*, 2023 IL 126461, on the issue of whether the trial court erred in denying leave to file a successive post-conviction petition and determine if a different result is warranted." *People v. Vega*, No. 128404 (Ill. Sept. 27, 2020).

¶ 5    Upon consideration of this case in light of our supreme court's decision in *Moore*, 2023 IL 126461, we find Mr. Vega cannot show cause for his failure to raise his proportionate penalties challenge in his earlier postconviction petition and affirm the circuit court's denial of leave for Mr. Vega to file a successive postconviction petition.

¶ 6                                      I. BACKGROUND

¶ 7                                     A. The Trial

¶ 8     Jesus Vega was tried and convicted for the murder of a man named Jose Soto who, on December 29, 2003, was shot and killed outside of a bar on Chicago's northwest side. As Mr. Vega challenges his sentence, not his conviction, our summary of the facts will be brief.

¶ 9     At Mr. Vega's trial, the key witness was Rosalee Soto, the victim's wife. She testified that sometime after 11 p.m. that night, she drove to a bar where her husband was socializing to drop off some cash she had taken out of an ATM for him. When she arrived at the bar, her husband came outside, walked over to her vehicle, and spoke to her through the passenger side window. After a brief conversation, she started to drive away.

¶ 10    Mr. Soto turned and started walking back towards the entrance of the bar, at which point Ms. Soto heard a gunshot. She then saw her husband take off running. Another man, who was wearing a gray hoodie and standing about four feet from her husband, began chasing him down the sidewalk. The man in the hoodie then stopped a few feet away from Ms. Soto's car, made eye contact with her, and fired four to five more shots at Mr. Soto. Terrified that she would be the next target, Ms. Soto tried to drive away from the gunman. As she sped away from the scene, her husband, bleeding profusely, climbed into the car through the passenger door.

¶ 11    Racing toward the hospital in a state of panic, Ms. Soto crashed into another vehicle. Eventually, an ambulance came to take Mr. Soto to a nearby hospital, where he died of his injuries. Police officers then arrived at the scene of the crash, and Ms. Soto provided them with a brief statement and a description of the shooter. When it became apparent that she too needed medical attention for injuries stemming from the car crash, she was also taken to a nearby hospital.

¶ 12    A few weeks later, on January 10, 2004, Ms. Soto went to a police station to view a lineup.

She instantly identified Mr. Vega as the man in the gray hoodie who had killed her husband. She reaffirmed this identification in the courtroom at trial.

¶ 13    After hearing damaging testimony from several other witnesses—including Mr. Vega's step-cousin, who testified that on the night of the murder, she and her brother had loaned a gray hoodie to Mr. Vega—the jury found Mr. Vega guilty of first degree murder.

¶ 14    The jury also found that Mr. Vega possessed or discharged a firearm during the commission of the offense, meaning that in addition to the mandatory 20-to-60-year base sentence he would receive for the murder conviction, he would also be subject to a mandatory firearm enhancement of 25 years to life. Thus, the statutory minimum Mr. Vega could receive at sentencing would be 45 years.

¶ 15                                    B. Sentencing

¶ 16    According to a presentencing investigation (PSI) report, Mr. Vega was the eldest of three children born to a single mother who worked as a nurse's aide. He had never met his father. He described his childhood as "normal" and denied any family history of physical, mental, sexual, or substance abuse. He also reported no personal history of mental illness or mental health treatment. The PSI report stated that Mr. Vega had stopped attending school after completing seventh grade. Mr. Vega also admitted to being a member of the "Maniac Latin Disciples" street gang since 1997, though he denied having any particular role or rank within the gang structure. The report also noted a number of juvenile adjudications on his record—for robbery, gang recruitment, burglary, possession of a controlled substance, and unlawful use of a weapon (UUW)—as well as an adult UUW conviction.

¶ 17    A sentencing hearing was held on January 19, 2006. The State asked the court for a term of between 45 years and natural life, arguing that after examining Mr. Vega's juvenile record and

considering his background, "there is no reason or justification or excuse for this shooting. There's nothing other than *** what it was which was pure violence ***."

¶ 18    In mitigation, the defense argued that even though the PSI report stated that Mr. Vega described his childhood as "normal," the fact that he stopped attending school in the seventh grade revealed a total lack of support and an absence of positive family role models in his life:

> "What kind of parents, what kind of home life, what kind of adult role model could possibly have allowed him to be what he became. ***
>
> Judge, I just submit to the Court that I think all of us could agree that no father, a mother who let her son stop going to school at 7th grade, a mother who allowed it to happen that he never attended a day of high school, his home life wasn't fine.
>
> No question about it he's a child of the streets. *** That's where he grew up. The streets created him and made him what he is, and there was no one to stop it."

After noting how at no point during the trial had any member of Mr. Vega's family appeared in the courtroom to show their support for him, the defense concluded by asking the court for a sentence of 45 years, the statutory minimum.

¶ 19    The court then issued its sentence, stating:

> "When I look at matters in mitigation, particularly from the pre-sentence report, his background does not appear to give any reason for the conduct, the criminal conduct that followed later in his life.
>
> He was raised on the northwest side by his mother and his mother alone, the eldest of three siblings; what he characterizes as a normal childhood, no hint of abuse, any type of abuse. What he calls a close relationship, family relationship was maintained.
>
> It is true that he has very little in the way of education. He finished grade school

while in custody, no high school attendance at all, no employment history, simply supported by his mother. No indication of alcohol or drug addiction or mental problems. He was a self admittedly [*sic*] a member of the Maniac Latin Disciples since 1997.

When I look at other factors in mitigation, I cannot say from anything in this record before me that bodily harm, serious bodily harm was not contemplated, threatened. In fact, it was caused. And while that's implicit with any homicide case, the manner of death is certainly a factor that the Court can consider, and none of it speaks well for Mr. Vega.

There's no hint of any provocation from this evidence, justification, excuse, any explanation other than unreasonable ones which the court certainly cannot fathom from this evidence.

And there is no, particularly today after what the Court has heard, certainly no indication to this Court that this type of situation would not recur in the near future, in any future if Mr. Vega was again restored to society and able to live freely among civilized members of society."

Describing the murder of Mr. Soto as "an execution" and concluding that "this defendant has been a danger in this particular community to other persons other than the one who lost his life," the court imposed a sentence of 75 years.

¶ 20                     C. Subsequent Procedural History

¶ 21    Mr. Vega filed a direct appeal (case No. 1-06-0629), and this court issued an order granting an agreed motion for summary disposition and directing the circuit court clerk to issue a corrected mittimus reflecting that Mr. Vega was entitled to 740 days of pretrial custody credit.

¶ 22    On March 24, 2008, Mr. Vega filed an initial postconviction petition asserting various claims for relief. On May 30, 2008, the circuit court issued an order summarily dismissing the

petition, finding it frivolous and patently without merit. This court then affirmed that summary dismissal. *People v. Vega*, 393 Ill. App. 3d 1105 (2009) (table) (unpublished order under Supreme Court Rule 23).

¶ 23                                    D. Mr. Vega's Successive Petition

¶ 24      On September 23, 2019, Mr. Vega filed the *pro se* motion seeking leave to file a successive postconviction petition that is the subject of this appeal. In that motion and attached petition, Mr. Vega argued that his *de facto* life sentence of 75 years, imposed for a crime committed when he was just 19 years old, violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution "where his sentencer failed to take into account the hallmark features of youth as now required by the U.S. Supreme and Illinois Courts." (referring to *Miller v. Alabama*, 567 U.S. 460 (2012)) and its Illinois progeny, specifically *People v. House*, 2015 IL App (1st) 110580, *vacated*, 2019 IL App (1st) 110580-B, and *People v. Harris*, 2018 IL 121932.

¶ 25      Mr. Vega further argued that he satisfied the gateway "cause and prejudice" standard required to be granted leave to file his successive petition because his claim was "based on law that was not in existence at the time he filed his earlier petition" and that "his claim involved a constitutional error so serious that his sentencing process violates due process." Mr. Vega included details in the petition about his childhood, highlighting that he was "raised in a single-parent household, his first contact with law enforcement was at age 11," and that "at the age of 13, he was sent to Illinois Youth Center, where he graduated from the eighth grade." He further noted that during his time in juvenile detention, "due to his inability to adjust," he was placed on psychotropic medication and that this medication "was not continued, nor did he receive any follow-up counseling" upon his release. He did not specify which medications he was prescribed,

nor he did attach any documents or medical records substantiating these claims.

¶ 26    On January 10, 2020, the circuit court issued an order denying Mr. Vega's motion for leave to file a successive petition, explaining that while Mr. Vega had adequately demonstrated cause— as his claim was rooted in caselaw decided in the years after the filing of his initial petition—he had failed to establish that he suffered any prejudice from the inability to bring the claim sooner.

¶ 27    In the court's view, Mr. Vega failed to show prejudice because the primary case he relied on to establish his claim, *People v. House*, 2019 IL App (1st) 110580-B, *rev'd in part, vacated in part*, 2021 IL 125124, did not apply to him based on key distinguishing facts. In *House*, this court held that the imposition of a mandatory life sentence on a 19-year-old convicted of murder under an accountability theory (we noted that the defendant in that case "merely acted as a lookout"), "shocked the moral sense of community, and thus violated the Proportionate Penalties Clause of the Illinois Constitution." *Id.* ¶ 26. Rejecting any comparison between Mr. Vega and the defendant in *House*, the court explained:

> "[t]he only similarity the two have is that they were both the age of 19. These cases are not analogous to one another, the court in *House* focused on how less culpable the defendant was in the commission of the crime. [Mr. Vega], in contrast, was the most culpable actor in the commission of the crime."

¶ 28    The court also found Mr. Vega's allegations about his history of mental illness to be conclusory, unsupported, and even contradicted by the existing record. Further, revisiting the transcript from the original sentencing hearing, the court found that "the trial court took into consideration various factors that are aligned with the requirements in emerging case law," before concluding that "[w]hen a court takes into account these considerations, a life sentence without parole has been determined to be acceptable" (citing *People v. Holman*, 2017 IL 120655, ¶ 46,

*overruled*, *People v. Wilson*, 2023 IL 127666). On these grounds, the court denied Mr. Vega leave, a decision which he now appeals.

¶ 29                                                    II. JURISDICTION

¶ 30    The circuit court denied Mr. Vega's motion for leave to file a successive postconviction petition on January 10, 2020. On May 6, 2020, this court allowed Mr. Vega to file a late notice of appeal. We thus have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 606 (eff. July 1, 2017) and Rule 651(a) (eff. July 1, 2017), governing appeals from final judgments in postconviction proceedings. The sequence of events following our initial appeal is outlined above, *supra* ¶ 3, and the case is again before this court because of our supreme court's supervisory order. *Vega*, No. 128404.

¶ 31                                                    III. ANALYSIS

¶ 32    The Post-Conviction Hearing Act establishes procedures by which a criminal defendant may challenge his conviction or sentence based on a substantial deprivation of his state or federal constitutional rights. 725 ILCS 5/122–1(a)(1) (West 2018); *People v. Caballero*, 228 Ill. 2d 79, 83 (2008). A postconviction proceeding is a collateral attack on the trial court proceedings. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Its scope is limited to constitutional issues that were not, and could not have been, previously adjudicated. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). Claims that were decided on direct appeal or in an earlier postconviction proceeding are generally barred by the doctrine of *res judicata*, and claims that could have been, but were not, raised in an earlier proceeding are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005).

¶ 33    Crucially, the Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-1(f) (West 2016). Successive petitions are disfavored, and, as our supreme court explained

in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002), this strict statutory bar is only relaxed when "fundamental fairness so requires." For petitioners like Mr. Vega, who are not asserting an actual innocence claim, the only way to overcome this significant procedural hurdle is to demonstrate "cause and prejudice" for failing to raise a claim earlier. *Id.*; *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23.

¶ 34                    A. Mr. Vega's As-Applied Proportionate Penalties Claim

¶ 35    On appeal, Mr. Vega claims that, as applied to him, a 75-year *de facto* life sentence, imposed for a crime committed when he was just 19 years old, violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). In support of this argument, Mr. Vega relies on recent case law governing the sentencing of juvenile and young-adult offenders. We summarize this caselaw briefly below. While in our initial decision we relied on this case law to find that Mr. Vega could show cause and prejudice under Illinois law to bring this claim, in light of our supreme court's recent decision in *Moore*, 2023 IL 126461, and the supreme court's supervisory order, it is now clear that he cannot and we must affirm.

¶ 36    In *Miller*, 567 U.S. at 479, the United States Supreme Court held that in all but the rarest of circumstances where a crime reflects "irreparable corruption," "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." See also *Montgomery v. Louisiana*, 577 U.S. 190, 206-11 (2016) (revisiting the Court's decision in *Miller* and characterizing it as a new substantive constitutional rule that must be applied retroactively on state collateral review). In arriving at and applying this new substantive rule, "the [] Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58.

¶ 37    In the aftermath of *Miller*, the Illinois Supreme Court has gone further than the United

States Supreme Court in protecting juveniles and young adults in at least two ways. First, it has extended *Miller*'s application beyond mandatory natural life sentences. In *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10, for example, it held that *Miller* applies equally where a juvenile has received a *de facto* life sentence. In *People v. Buffer*, 2019 IL 122327 ¶¶ 27, 40-41, it went on to define such a sentence as one requiring more than 40 years of imprisonment. The court also initially held in *Holman*, 2017 IL 120655, ¶ 40, that *Miller* applied to discretionary life sentences, though it recently overruled that decision, concluding that it was at odds with subsequent United States Supreme Court precedent. *People v. Wilson*, 2023 IL 127666, ¶ 42 (citing *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S.Ct. 1307, 1313 (2021)).

¶ 38    Second, the Illinois Supreme Court has also shown some willingness to depart from limiting these considerations to defendants under the admittedly arbitrary age of 18. The proportionate penalties clause of our state constitution, Ill. Const. 1970, art. I, § 11, whose purpose is "to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship," has provided the ideological foundation for this departure. *People v. Carrasquilllo*, 2020 IL App (1st) 180534, ¶ 89.

¶ 39    By way of the proportionate penalties clause, our supreme court has held that emerging adults—at least those who were 20 years of age or younger at the time of their crimes—may also rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support *as-applied* challenges to life sentences. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (noting that a defendant, who was 19 years old at the time of his crime, could not bring such a claim for the first time on direct appeal but was "not necessarily foreclosed" from asserting it in postconviction proceedings); *Harris*, 2018 IL 121932, ¶ 48 (concluding that the as-applied, youth-based sentencing claim of a defendant who was 18 at the time of his crime, was "more

appropriately raised" in postconviction proceedings). In *People v. House*, 2021 IL 125124, ¶¶ 29-31, our supreme court reaffirmed that a young adult postconviction petitioner, 18 or over, can make an as-applied challenge under the proportionate penalties clause based on a developed evidentiary record as to how the "science concerning juvenile maturity and brain development applies equally to young adults, or to petitioner specifically."

¶ 40    In opening this door, our supreme court has accepted the possibility that an individual like Mr. Vega may be able to demonstrate through an adequate factual record that at the time he committed his crime, specific characteristics made him the functional equivalent of a juvenile, such that a *de facto* life sentence, imposed without the sentencing judge considering the safeguards established in *Miller*, violates the Illinois constitution because it is "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009).

¶ 41    This recognition that individuals 18 and older at the time of their crimes should not necessarily be treated as adults for sentencing purposes is supported by recent scientific literature, which has found that "during emotionally charged situations, late adolescents (ages 18-21) respond more like younger adolescents (ages 13-17) than like young adults (22-25) due to differences in brain maturation." Center for Law, Brain & Behavior at Massachusetts General Hospital, White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers (Jan. 27, 2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/. This recognition is also reflected in the 2019 parole provision using the age of 21 as a cutoff. See P.A. 100-1182, § 5 (eff. June 1, 2019) (now section 5-4.5-115 of the Illinois Unified Code of Corrections (730 ILCS 5/5-4.5-115) (West 2020)).

¶ 42    This law—which marked the first expansion of eligibility for discretionary parole in

Illinois since our state's parole system was effectively abolished in 1978—established a new process by which those incarcerated individuals "*under the age of 21* at the time of the commission of an offense" (emphasis added) will now be able to petition the Prisoner Review Board (PRB) to be released on parole after serving a minimum sentence. 730 ILCS 5/5-4.5-115 (West 2020). Under this new regime, individuals like Mr. Vega who are convicted of a murder committed before they turned 21 will now be eligible for parole review after serving 20 years. *Id.* The law, however, expressly applies only to those "sentenced after June 1, 2019," meaning that unlike those being sentenced today, Mr. Vega will have no equivalent opportunity to eventually go before the PRB and demonstrate that his actions were prompted by juvenile immaturity and that he has since matured into someone who can and should be released.

¶ 43    At the same time, the date of Mr. Vega's crime also ensured that he would not benefit from any opportunities to reduce his sentence by earning day-for-day good time credits. By the time he was sentenced in 2006, Illinois had passed its truth-in-sentencing statute in 1998, which requires that "a prisoner who is serving a term for first degree murder *** shall serve the entire sentence imposed by the court." 730 ILCS 5/3-6-3 (West 2020).

¶ 44    Thus, too old to qualify for a parole hearing, yet too young to qualify for earned good-time credits, the only hope Mr. Vega had for avoiding a *de facto* life sentence was via the narrow door left open by our supreme court in *House*. *House*, however, did not speak directly to whether a young adult would have cause to challenge their sentence based on the proportionate penalties clause in a *successive* postconviction petition. Our supreme court only recently spoke directly to that question in *Moore*, 2023 IL 126461, after we issued our initial decision in this case.

¶ 45    In *Moore*, the defendants in the two consolidated cases, Mr. Moore and Mr. Williams, were both "sentenced to life in prison without parole for separate murders committed when they were

19 years old." *Id.* ¶ 1. Both defendants sought leave to file successive postconviction petitions, arguing their sentences violated, in relevant part, the proportionate penalties clause of the Illinois Constitution and citing *Miller*, 567 U.S. 460. *Moore*, 2023 IL 126461, ¶¶ 15, 25. The Fourth District affirmed the denial of Mr. Moore's motion. *Id.* ¶ 14. The Second District, however, found that Mr. Williams had shown both cause and prejudice, concluding that because the United States Supreme Court had not decided *Miller* by the time Mr. Williams filed his initial postconviction petition, "an objective factor impeded [him] from bringing his constitutional claims based on the reasoning of *Miller* and *Montgomery*." *Id.* ¶ 29. The Illinois Supreme Court granted petitions for leave to appeal from Mr. Moore and from the State in Mr. Williams's case, and consolidated the appeals. *Id.* ¶¶ 17, 31.

¶ 46    In its decision, our supreme court noted that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a [juvenile offender] to raise a claim under the proportionate penalties clause." (Internal quotation marks omitted.) *Id.* ¶ 40. While *Miller* directly applies to juveniles, it does not directly apply to young adults. *Id.* And because *Miller* does not provide cause to those to whom it *does* directly apply—juvenile offenders—the court held that "it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id.*

¶ 47    The supreme court noted it had previously found that adults with intellectual disabilities did not have cause under *Miller* to challenge their sentences under the proportionate penalties clause because " '[l]ong before *Miller*, Illinois law recognized the reduced culpability of defendants with intellectual disabilities.' " *Id.* ¶ 41 (quoting *People v. Clark*, 2023 IL 127273, ¶ 62). In addition, it had also previously recognized that " 'long before *Miller*, Illinois law recognized the special status of juvenile offenders for purposes of applying the principles under

- 14 -

the proportionate penalties clause.' " *Id.* (quoting *Clark*, 2023 IL 127273, ¶ 61). The court then went on to explain that it was clear, from the arguments raised at Mr. Moore's and Mr. Williams's sentencing hearings, that "the parties knew Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause." *Id.* ¶ 42. The court concluded in *Moore* that because "*Miller* did not change the law applicable to young adults, it [did] not provide cause for the proportionate penalties challenges advanced in [Mr.] Moore's and [Mr.] Williams's proposed successive postconviction petitions." *Id.*

¶ 48    In light of *Moore,* it is now clear that Mr. Vega cannot show cause for failing to bring this claim earlier and thus cannot avoid the general bar to successive postconviction petitions

¶ 49                                B. Cause and Prejudice

¶ 50    With the exception of claims for actual innocence, the only way a petitioner can overcome the bar on any consideration of a successive postconviction petition is to establish both (1) cause for failing to raise a claim earlier and (2) prejudice stemming from that failure. *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 34. To show cause, a defendant must show an "objective factor external to the defense that impeded [his] efforts to raise the claim in an earlier proceeding." *People v. Davis*, 2014 IL 115595, ¶ 14. To show prejudice, a defendant must show that the claimed error "so infected the trial that the resulting conviction or sentence violates due process." *Id.* "Both prongs must be satisfied for the defendant to prevail." *Id.* "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo.*" *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 51                                        1. Cause

¶ 52    Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) provides that "[p]oints not argued are

forfeited." In our initial decision, we agreed with Mr. Vega that, although the State asserted in a heading that Mr. Vega "failed to establish cause *or* prejudice" (emphasis added), having made no argument in support of the absence of cause in the body of its brief, the State had forfeited that argument. *Vega*, 2022 IL App (1st) 200663-U, ¶ 43. We further found that there was little basis for the State to dispute that the law governing the sentencing of young adults had changed significantly since Mr. Vega filed his initial postconviction petition in 2008, and that this established cause for his failure to include this claim in that petition. *Id.* ¶ 44. We shared the circuit court's view that Mr. Vega made a *prima facie* showing of cause in his petition. *Id.*

¶ 53    However, forfeiture is a limitation on the parties and not the reviewing court. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. Our supreme court, in an exercise of its supervisory authority, has specifically remanded this case to us for consideration in light of its recent decision in *Moore*, 2023 IL 126461, which dealt squarely with the question of whether a young adult offender has cause to bring a successive postconviction petition. In these circumstances, we have no choice but to consider whether Mr. Vega has demonstrated cause for bringing a successive postconviction petition.

¶ 54    As noted above, in *Moore*, our supreme court made clear that *Miller* does not provide a young adult offender with cause to challenge his sentence in a successive postconviction petition under the proportionate penalties clause. *Id.* ¶ 40. We are bound by that holding and must conclude that here Mr. Vega, as a young adult offender, cannot show cause for his failure to earlier raise his proportionate penalties challenge to his sentence based on *Miller*. *Id.* ¶ 40.

¶ 55                              2. Prejudice

¶ 56    In our initial decision, we found that Mr. Vega had shown he would be prejudiced by his failure to raise his proportionate penalties claim in his earlier postconviction petition. *Vega*, 2022

IL App (1st) 200663-U, ¶¶ 49-64. However, because Mr. Vega cannot show cause for having failed to bring his proportionate penalties claim sooner, we need not consider whether he can show prejudice. *Davis*, 2014 IL 115595, ¶ 14.

¶ 57                                    IV. CONCLUSION

¶ 58    Mr. Vega cannot show cause for his failure to file a proportionate penalties challenge to his sentence in his first postconviction petition. Accordingly, we affirm the circuit court's denial of his motion for leave to file a successive postconviction petition.

¶ 59    Affirmed.