2024 IL App (1st) 182047-B

No. 1-18-2047

Opinion filed June 28, 2024

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 25180 |
| | ) | |
| KIRK HORSHAW, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    The trial court denied defendant Kirk Horshaw's motion for leave to file a successive petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). We reversed the judgment of the trial court and remanded for further postconviction proceedings. *People v. Horshaw*, 2021 IL App (1st) 182047 (*Horshaw I*). The State then petitioned the supreme court for leave to appeal. On September 27, 2023, the supreme court denied leave to appeal, but it issued a supervisory order directing us to vacate our judgment and consider the effect of *People v. Moore*, 2023 IL 126461, on the issue of whether the trial court

erred in denying leave to file a successive postconviction petition and determine if a different result is warranted. Accordingly, we vacate our judgment in *Horshaw I*, 2021 IL App (1st) 182047.

¶ 2    On appeal, defendant contends that he made the necessary showing of both cause and prejudice to be granted leave to file a successive postconviction petition and asks this court to remand for further postconviction proceedings and the appointment of counsel.

¶ 3    For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 4                                  I. BACKGROUND

¶ 5    This appeal arises from the denial of defendant's motion for leave to file a successive petition for postconviction relief. The evidence leading to defendant's convictions and history of this case has been previously discussed in our decisions affirming defendant's convictions on direct appeal (*People v. Horshaw*, 2013 IL App (1st) 111072-U), and in affirming the dismissal of defendant's initial petition for postconviction relief (*People v. Horshaw*, 2016 IL App (1st) 140829-U). We set out those facts pertinent to defendant's motion for leave to file a successive petition for postconviction relief necessary for an understanding of the issue and our resolution thereof.

¶ 6    Following a bench trial in 2011, defendant was convicted of the first degree murder of Aaron Crawford (720 ILCS 5/9-1(a)(1) (West 2002)) and attempted murder of Daniel Wesley (*id.* §§ 8-4(a), 9-1(a)(1)). The evidence at defendant's trial showed that Jamaine Williams, Crawford, and Wesley were members of the Black Disciples street gang and that defendant and codefendant,

---

[1]We held oral argument in this case on September 9, 2021, and following the issuance of the Illinois Supreme Court's September 27, 2023, supervisory order, allowed supplemental briefing on November 9, 2023.

Chancellor Aaron, were members of a rival gang, the Gangster Disciples. The two gangs were involved in a war and would shoot each other on sight.

¶ 7　On May 7, 2002, Williams was walking along 71st Street in Chicago when he saw Crawford and Wesley on one side of the street, while defendant, codefendant, and a third man were standing in a vacant lot across the street. An argument ensued between the two groups, and Williams heard Crawford say, "You all going to shoot, shoot." Williams jogged toward Crawford, and when he was near Crawford and Wesley, defendant, who was 18 years old at the time, and codefendant pulled out their guns and fired multiple shots. Crawford ran in one direction, and Williams and Wesley ran in another, taking shelter in a building. Defendant and codefendant then fled the area. Williams and Wesley found Crawford lying on the ground of the vacant lot and took him to the hospital, but he died of a gunshot wound. Williams spoke to the police shortly after the incident and told them defendant and codefendant shot Crawford, and he identified both men in a photo array. Williams did not see Crawford or Wesley with a gun during the shooting.

¶ 8　Wesley, who was incarcerated in Minnesota for aggravated robbery and had two prior convictions in Illinois for unlawful use of a weapon, testified that, on the day of the shooting, he had been smoking marijuana and drinking. At about 9 p.m. on the night in question, he was outside on 71st Street when he heard shots and saw Crawford on the ground. Wesley ran and took shelter. When the shooting stopped, Wesley and Williams lifted Crawford into a car and accompanied him to the hospital. Wesley and Williams returned to a restaurant near the scene of the shooting, where police saw them. Wesley told the police he did not know anything, but the police took them to the police station. The detectives separated Wesley and Williams, and Wesley testified the police forced Wesley to identify the shooters from a photo array. Wesley acknowledged that he identified

defendant and codefendant but explained "it was script" and that he was drunk and high, did not know what he was saying, and was just trying to leave the station.

¶ 9    Wesley had previously given a written statement, grand jury testimony, and testimony at codefendant's trial, in which he identified defendant and codefendant as the shooters. His prior statement and testimony were consistent with each other and similar to Williams's account of the shooting. During codefendant's trial, Wesley testified that Crawford did not have a gun during the shooting. The written statement, grand jury testimony, and testimony at codefendant's trial were admitted as substantive evidence at trial.

¶ 10    Karen Luckett testified that she lived next to the site of the shooting. She saw two men get out of a car and identified defendant as one of them. Although she did not see the shooting, she heard the gunshots.

¶ 11    Tiffany Vining, also known as Tiffany Morgan, testified that, at the time of the shooting, she was on drugs and she did not remember the incident. However, Vining's July 2002 written statement to an assistant state's attorney and a police detective, which was admitted as substantive evidence, indicated that at 9 p.m. on the night in question she saw Crawford arguing with defendant, codefendant, and a third man she did not know. Codefendant pulled out a gun and "acted like he was going to shoot [Crawford]." After defendant, codefendant, and the third man crossed the street toward a vacant lot, defendant also pulled out a gun, and he and codefendant started shooting at Crawford. Crawford never had a gun in his hands.

¶ 12    Donnell Russell testified that he was arrested for possession of cannabis in 2004 and, while at the police station, he told officers he had information about the May 7, 2002, shooting. In particular, he told detectives that on September 6, 2002, he and defendant were driving around

searching for marijuana to buy. Russell had not seen defendant for a while and asked where he had been. Defendant responded that he had been "laying low" because he and codefendant were involved in a shooting near 71st Street and Paxton Avenue. Defendant told him that he "caught somebody who shot at him earlier."

¶ 13    Detective John Fassl testified that he and his partner interviewed Wesley and Williams at the police station on the night of the shooting. Both men identified defendant and codefendant as the shooters from a photo array. Detective Fassl denied that Wesley was given any kind of "script" or that he was told who to identify.

¶ 14    Officer Ware testified that on the day after the shooting he and his partner saw a car that was reported to have been involved in the shooting and attempted to pull it over. A chase followed, during which defendant and codefendant jumped out of the car. The car crashed, and the driver, Ricardo Martin, jumped out. Officer Ware and his partner pursued and arrested Martin because he was seen discarding a gun. Defendant and codefendant were subsequently arrested.

¶ 15    Defendant presented four alibi witnesses in his defense at trial: defendant's stepdaughter Jasmine Brooks, family friend Charles Parks, defendant's sister-in-law Clarissa Greer, and defendant's wife Erica Horshaw. All four witnesses testified that defendant was in Georgia on the date of the shooting and served as a pallbearer for a funeral that took place the following day. The defense introduced into evidence a program from the funeral, which listed the date and named defendant as a pallbearer.

¶ 16    After defendant was found guilty of the first degree murder of Crawford and the attempted first degree murder of Wesley, a sentencing hearing was held on April 7, 2011. Neither side called witnesses or presented any evidence. The presentence investigation report (PSI) established the

following: defendant had one prior felony conviction from the state of Georgia, for which he received a seven-year sentence in the Georgia Department of Corrections, and two Illinois juvenile convictions for possession of a controlled substance. Defendant described his upbringing as "fair" and denied that he was abused or neglected as a child. Defendant lived with his mother and saw his father regularly until his father died when defendant was 12 years old. Defendant's older brother had a criminal history. Defendant was married and had two children with whom he resided. Defendant attended high school for two years, during which time he was a member of the football and basketball teams and received average grades. He dropped out of high school because "it was too far." Defendant had not completed his general equivalency diploma (GED) and was never previously employed.

¶ 17    Defendant was supported by his mother and his wife and denied a history of alcohol abuse, but admitted that he began smoking marijuana by age 15 and spent "an unlimited amount of money daily" on his marijuana usage. He was never evaluated or treated for drug usage. Defendant was in good health, was not under a doctor's care, and was not taking prescription medications. Defendant was a member of the Gangster Disciples Street Gang from ages 13 to 22. He held no role or rank in the structure. In his free time, defendant enjoyed writing letters and playing chess. The PSI contained no psychological or physiological information and only indicated that defendant denied being diagnosed with a behavioral or learning disorder.

¶ 18    At sentencing, the State's argument consisted of pointing out the prior Georgia conviction for possession of cocaine with intent to distribute and two juvenile adjudications for possession of a controlled substance and that the killing in the instant case was the result of a gang war.

¶ 19    Defense counsel claimed that defendant's conviction in Georgia stemmed from drugs being found in an apartment he shared with his wife, and he pleaded guilty to prevent his wife from being incarcerated. Defense counsel asked the trial court to impose the minimum sentence.

¶ 20    The trial court stated it was considering the statutory factors in aggravation and mitigation but otherwise did not engage in a discussion of any of defendant's attributes or characteristics or make any findings about defendant's rehabilitative potential. The trial court sentenced defendant to the minimum sentence for first degree murder, 20 years, plus a 20-year firearm enhancement, and the minimum sentence of 6 years for the attempted murder, plus 20 for the firearm enhancement, for a total of 66 years in the Department of Corrections.

¶ 21    We affirmed the trial court's judgment on direct appeal. *Horshaw*, 2013 IL App (1st) 111072-U. On December 11, 2013, defendant filed a *pro se* postconviction petition in which he alleged multiple claims of ineffective assistance of counsel at trial and that the evidence was insufficient to prove his guilt beyond a reasonable doubt. This court affirmed the trial court's dismissal of defendant's postconviction petition on August 19, 2016. *Horshaw*, 2016 IL App (1st) 140829-U.

¶ 22    On September 12, 2016, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)), seeking to vacate the 20-year firearm enhancement that accompanied his attempted first degree murder sentence. In a written order, on December 8, 2016, the trial court dismissed defendant's petition. Defendant did not appeal the ruling.

¶ 23    Defendant filed a motion for leave to file a successive petition on February 14, 2018, alleging that his sentence violated the eighth amendment to the United States Constitution (U.S.

Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). His motion relied on "previously unavailable science and social science research that has brought about a 'change in law' regarding sentences of youthful offenders when there is evidence of 'immature brain development' associated with youth."

¶ 24     Defendant also relied on the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016); the science and social science research discussed in those cases; and additionally, this court's decisions in *People v. House*, 2015 IL App (1st) 110580, *People v. Sanders*, 2016 IL App (1st) 121732-B, and *People v. Harris*, 2016 IL App (1st) 141744, in support of his claim. Defendant alleged that "[l]ike *Harris*, who just turned (18) years old just a few months before the shooting, [defendant] has a plausible argument of immaturity." Defendant clarified that his as-applied challenge was "fact specific" to his circumstances and should have been considered in imposing sentence "to effectuate the constitutional mandate of restoring petitioner to useful citizenship like *Harris* and *House*."

¶ 25     Defendant asserted that his sentence exceeded his "life expectancy" and was imposed "without taking into consideration petitioner's age, adolescent brain deficiencies, significant head trauma's [*sic*], attendant characteristics, family and support, education, peer pressures, maturity and rehabilitative potential together with other mitigating factors." Defendant claimed that he "suffered most, if not all of the mitigating factors and characteristics of youth and immaturity as described in *Miller*, *Roper*, *Graham*, *House* and *Harris*" and that there was a reasonable probability that he would have received a lesser sentence within his life expectancy had the trial court been able to consider his individualized characteristics.

¶ 26 Defendant also attached multiple "emerging adult" articles regarding brain development and certificates of participation in various classes since being committed to the Department of Corrections. Defendant's motion for leave to file a successive petition referenced "mitigating evidence" consisting of "individual characteristics" that he included in his "attached" successive petition, which itself is referenced five times within his motion. The successive petition, however, is not contained in the record on appeal.[2]

¶ 27 On August 3, 2018, the trial court issued a written order denying defendant's motion. The court rejected defendant's eighth amendment claim, noting that *Miller* does not apply to offenders over 17 years of age, and it found that defendant failed to establish cause and prejudice for his proportionate penalties clause claim.

¶ 28 Defendant filed a timely notice of appeal from that decision on August 30, 2018. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. Feb. 6, 2013) governing appeals from final judgments in postconviction proceedings. In our original decision, we held that defendant could not establish cause and prejudice for his eighth amendment claim but that he had demonstrated both cause and prejudice to be granted leave to file a successive petition with respect to his proportionate penalties claim. *Horshaw I*, 2021 IL App (1st) 182047, ¶¶ 54, 122, 150. Since we decided *Horshaw I*, the landscape regarding *Miller* and proportionate penalties clause claims

---

[2]On July 28, 2021, we issued an order directing the parties to prepare a supplemental record containing a copy of defendant's successive petition or, if no petition was filed, submit a supplemental brief clarifying the situation. In response to our order, both in his supplemental brief and at oral argument, defense counsel stated that he investigated this matter further but that such investigation did not reveal the existence of a successive petition.

in successive postconviction petitions has shifted significantly, owing in part to our supreme court's decision in *Moore*, which now prompts us to reconsider our decision.

¶ 29                                    II. ANALYSIS

¶ 30    Defendant alleges that he made a sufficient showing of cause and prejudice to require that the court grant him leave to file a successive postconviction petition in which he claimed that his 66-year aggregate sentence was a *de facto* life sentence that was unconstitutional as applied to him under both the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11.

¶ 31    At the time of defendant's sentencing hearing, an aggregate sentence of 66 years was the mandatory minimum sentence available to the court where the sentencing statutes mandated that (1) the trial court add firearm enhancements to both his murder and attempted murder sentences, (2) the murder and attempted murder sentences be served consecutively, and (3) defendant serve the entire murder sentence and 85% of the attempted murder sentence.

¶ 32    The State maintains that leave to file was properly denied where (1) the eighth amendment protections of *Miller* do not apply to nonjuveniles, (2) defendant is barred from raising an as-applied constitutional challenge to his sentence where it was "discretionary," and (3) defendant has failed to make a *prima facie* showing of cause and prejudice to allow the filing of his successive petition.

¶ 33                A. The Requirements of the Post-Conviction Hearing Act

¶ 34    The Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79

(1998); 725 ILCS 5/122-1 (West 2018). A defendant may raise a constitutional challenge to both his conviction and his sentence. *People v. Davis*, 2014 IL 115595, ¶ 13. The Act, however, contemplates the filing of a single petition. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); 725 ILCS 5/122-1(f) (West 2018).

¶ 35   Successive petitions are highly disfavored, and the statutory bar will be relaxed only when fundamental fairness requires it. *People v. Holman*, 2017 IL 120655, ¶ 25, *overruled on other grounds by People v. Wilson*, 2023 IL 127666. A successive filing requires leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-1(f) (West 2018). For leave to be granted, defendant must make a *prima facie* showing of both "cause" and "prejudice" by submitting sufficient pleadings and documentation to permit the circuit court to make an independent determination on the legal question raised. *People v. Bailey*, 2017 IL 121450, ¶ 24. The "cause and prejudice" test for successive postconviction pleadings is a higher burden than the "frivolous or patently without merit" standard for initial pleadings. *People v. Edwards*, 2012 IL 111711, ¶¶ 24-29.

¶ 36   The cause-and-prejudice test is a procedural prerequisite to obtaining further review of a defendant's claim. *People v. Bland*, 2020 IL App (3d) 170705, ¶ 9. To show cause, a defendant must identify an objective factor that impeded his ability to raise the claim in his initial petition. *Davis*, 2014 IL 115595, ¶ 14. To show prejudice, a defendant must demonstrate that the claim so infected the trial that the resulting conviction or sentence violated due process. *Id.*

¶ 37   We review the denial of leave to file a successive petition *de novo*. *Bailey*, 2017 IL 121450, ¶ 13. Under the *de novo* standard, a reviewing court performs the same analysis that the trial court would perform, making the question on review whether the trial court's decision was correct as a

matter of law. *People v. McDonald*, 2016 IL 118882, ¶ 32. Leave to file a successive petition should only be denied where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. In answering this question, we take as true all well-pled allegations in the petition that are not positively rebutted by the trial record and reject those allegations that are positively rejected by the trial record. *People v. Robinson*, 2020 IL 123849, ¶ 45. When the requirements for leave to file are met, the successive petition is docketed directly for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶¶ 25, 28.

¶ 38    With the rules that attend successive petitions now in place, we turn our attention to the substance of defendant's claims under both the eighth amendment and the proportionate penalties clause.

¶ 39                    B. Defendant's Eighth Amendment Claim

¶ 40    Defendant first argues that he stated a viable claim that his sentence violated the eighth amendment and that he established cause and prejudice for failing to raise the claim in an earlier proceeding. We disagree and begin by tracing the eighth amendment principles that apply to juvenile and young adult offenders.

¶ 41    In *Roper*, the Supreme Court held that the eighth amendment categorically prohibits death sentences for juvenile defendants. *Roper*, 543 U.S. at 578-79. Next, in *Graham*, the Court determined that the eighth amendment likewise categorically bars sentences of natural life in prison for juveniles who commit crimes other than homicide. *Graham*, 560 U.S. at 82. Then, in *Miller*, the Court held that a mandatory sentence of life without the possibility of parole violates

the eighth amendment when imposed for a murder committed as a juvenile. *Miller*, 567 U.S. at 470, 489. While declining to consider whether the eighth amendment required a categorical prohibition on sentences of life without parole for juvenile murder defendants, the Court suggested that such sentences would be appropriate in rare cases, provided that the sentencer took into consideration "how [juveniles] are different [from adults], and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

¶ 42    The rationale underlying the Court's holdings in *Miller*, *Graham*, and *Roper* is that juveniles have unique characteristics that give them both "diminished culpability and greater prospects for reform" compared to adult defendants. *Id.* at 471 (citing *Graham*, 560 U.S. at 68). These characteristics include a lack of maturity, recklessness, impulsiveness, and vulnerability to negative influences from family or peers. *Id.* (citing *Roper*, 543 U.S. at 569). In addition, because a juvenile defendant's "character is not as 'well formed' as an adult's," his or her conduct is "less likely to be 'evidence of irretrievabl[e] deprav[ity].' " *Id.* (quoting *Roper*, 543 U.S. at 570). While recognizing that these characteristics "do not disappear when an individual turns 18" (*Roper*, 543 U.S. at 574), the Court limited its holdings to juveniles, *viz.* defendants who were under the age of 18 when they committed their crimes. *Miller*, 567 U.S. at 465; see *People v. Harris*, 2018 IL 121932, ¶ 56 (noting that the United States Supreme Court "has never extended its reasoning to young adults aged 18 or over").

¶ 43    In the wake of *Miller*, as defendant conceded in his reply brief, our own supreme court has held that relief pursuant to *Miller*-based eighth amendment claims is unavailable to emerging adults like himself who turned 18 before the offense took place. *Harris*, 2018 IL 121932, ¶ 61. Our supreme court alone can overrule and modify its previous opinion. *People v. Ellis*, 2020 IL

App (1st) 190774, ¶ 26. *Harris* remains the controlling law, and we are obligated to follow it. *People v. Artis*, 232 Ill. 2d 156, 163 (2009). We therefore reject defendant's eighth amendment challenge.

¶ 44                                    C. Defendant's Proportionate Penalties Claim

¶ 45    We next consider whether defendant established cause for failing to raise his proportionate penalties clause argument in his initial postconviction petition. Because the issue of cause is dispositive, we need not address, as we did previously, whether defendant's sentence was a mandatory *de facto* life sentence or whether he successfully established prejudice.

¶ 46    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*). The proportionate penalties clause provides broader protections than those provided in the eighth amendment. *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-78; *People v. Clemons*, 2012 IL 107821, ¶ 36.

¶ 47    We can chart the progression of our proportionate penalties jurisprudence as it relates to the principles found in *Miller*, beginning with *People v. Thompson*. There, the defendant was convicted of two separate first degree murders, committed when he was 19, and received a natural-life sentence. *People v. Thompson*, 2015 IL 118151, ¶¶ 4, 7. Following his direct appeal and postconviction proceedings, the defendant appealed the dismissal of a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West

2010)). *Thompson*, 2015 IL 118151, ¶¶ 13, 15. On appeal, defendant raised for the first time a facial and as-applied challenge to his life sentence based on the eighth amendment and the proportionate penalties clause. *Id.* ¶ 17. While our supreme court held that the defendant was foreclosed from raising his challenges for the first time on appeal, it emphasized that the defendant, as a young adult, was not foreclosed from renewing his *Miller*-based proportionate penalties clause challenges in the trial court and that the Act was expressly designed to resolve such constitutional issues. *Id.* ¶ 44.

¶ 48    Next, in *Harris*, the defendant, who was 18 at the time he committed first degree murder and attempted first degree murder, claimed on direct appeal that his 76-year sentence violated the proportionate penalties clause and the eighth amendment. *Harris*, 2018 IL 121932, ¶¶ 1, 17. The supreme court rejected that claim because it was raised for the first time on direct appeal, and therefore no evidentiary hearing had taken place to develop the record. *Id.* ¶¶ 38-40, 46.

¶ 49    *Thompson* and *Harris*

"opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." (Internal quotation marks omitted.) *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 50    *Thompson* and *Harris* were followed by *House*, where the defendant, who was 19 at the time he shot and killed two people, argued that his mandatory natural life sentence violated the proportionate penalties clause. *People v. House*, 2021 IL 125124. ¶¶ 5, 21. Our supreme court

remanded the defendant's initial postconviction petition for further second-stage proceedings because the record was not adequately developed. *Id.* ¶ 32. In doing so, the court nevertheless reaffirmed that *Thompson* and *Harris* paved a way for young adults to make as-applied challenges to their life sentences using the proportionate penalties clause and the principles contained within *Miller*. *Id.* ¶¶ 21-31.

¶ 51 However, shortly before *House* was decided, the supreme court also decided *Dorsey*, which was a first step toward narrowing the supreme court's view of this issue in the context of successive petitions. In *Dorsey*, the defendant, who was 14 at the time he committed murder in 1996, filed a successive postconviction petition on December 17, 2014. *People v. Dorsey*, 2021 IL 123010, ¶ 23. For the first time on appeal, the defendant argued that his sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 68. Although the supreme court held that this claim was forfeited and barred by *res judicata*, it also stated for the first time that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *Id.* ¶¶ 70, 73-74. It reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Id.* ¶ 74. Thus, *Dorsey* concluded that *Miller*'s unavailability prior to 2012 only deprived the defendant of "some helpful support." (Internal quotation marks omitted.) *Id.*

¶ 52 *Dorsey* was followed by *People v. Clark*, in which the defendant committed murder at the age of 24 in 1993. *People v. Clark*, 2023 IL 127273, ¶¶ 1, 4. In 2018, after seeking initial postconviction relief in 2001, and again in 2012, the defendant sought further successive postconviction relief, arguing that his 90-year sentence violated the proportionate penalties clause

of the Illinois Constitution due to the defendant's age and intellectual disabilities. *Id.* ¶¶ 24-26. *Clark* held that *Miller* did not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders, and that defendant "had the essential legal tools" to raise his claim in his initial petition. (Internal quotation marks omitted.) *Id.* ¶ 93. In rejecting the defendant's claims, the supreme court further reasoned that *Thompson* and *Harris* "addressed the possibility of a defendant raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *Clark*, 2023 IL 127273, ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶¶ 1, 44, and *Harris*, 2018 IL 121932, ¶¶ 1, 48).

¶ 53     Shortly after *Clark* was decided, the supreme court decided *Moore*, which precipitated the supervisory order that now causes us to reconsider our holding in *Horshaw I*. In *Moore*, two consolidated defendants received discretionary life sentences for separate first degree murders committed when they were 19 years old. *Moore*, 2023 IL 126461, ¶¶ 1, 12, 23. Moore and Williams filed motions for leave to file successive postconviction petitions in 2018 and 2017, respectively, claiming that, pursuant to *Miller*, their sentences violated both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. *Id.* ¶¶ 15, 25. The appellate court affirmed the denial of leave to file Moore's successive petition and reversed as to Williams. *Id.* ¶¶ 17, 29-30.

¶ 54     Regarding the defendants' proportionate penalties claims, *Moore* reiterated that "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders." (Internal quotation marks omitted.) *Id.* ¶ 42. Because *Miller* did not change the law applicable to young adults, *Moore* held that both defendants failed to

establish cause for raising their sentencing challenges in successive petitions. *Id.* "As *Miller* does not directly apply to young adults, it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id.* ¶ 40.

¶ 55 Finally, in *People v. Hilliard*, the defendant, who was 18 when he committed first degree murder, sought postconviction relief alleging that the 25-year firearm enhancement for his offense violated the eighth amendment and the proportionate penalties clause. *People v. Hilliard*, 2023 IL 128186, ¶¶ 1, 11. Although the supreme court rejected the defendant's claim because the sentence he was challenging was not a mandatory life sentence, it repeated its narrow view of *Thompson* and *Harris*. *Id.* ¶ 27. The court said, " 'those cases addressed the possibility of a defendant raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions.' " (Emphases in original.) *Id.* (quoting *Clark*, 2023 IL 127273, ¶ 88). The court also observed that *House*, too, involved both a mandatory life sentence and an initial postconviction petition. *Id.*

¶ 56 In the context of these cases, defendant encourages us to interpret *Moore* narrowly and hold that it does not apply to defendant because *Moore* concerned defendants who received discretionary life sentences. Defendant argues that defendants who received discretionary life sentences cannot establish cause because they did, in fact, have "the essential legal tools" to challenge their sentences under the proportionate penalties clause. (Internal quotation marks omitted.) *Moore*, 2023 IL 126461, ¶ 42. It is undoubtedly true that precedent for challenging excessive discretionary sentences under the proportionate penalties clause has existed for decades. See, *e.g.*, *People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977). But, defendant argues, no similar precedent for challenging mandatory natural life sentences imposed on emerging adults existed

until *Miller* and the Illinois cases that opened the door to applying *Miller* were decided. Defendant points to three cases, *People v. Griffin*, *People v. McCoy*, and *People v. Winters* as support for the conclusion that proportionate penalties challenges to mandatory life sentences, when made by emerging adults, have not been historically available. See *People v. Griffin*, 368 Ill. App. 3d 369, 378-79 (2006) (rejecting 17-year-old's proportionate penalties challenge to mandatory natural life sentence for multiple first degree murder convictions); *People v. McCoy*, 337 Ill. App. 3d 518, 521-25 (2003) (same for a 19-year-old defendant); *People v. Winters*, 349 Ill. App. 3d 747, 750-51 (2004) (same for 18-year-old defendant); but see *Leon Miller*, 202 Ill. 2d at 338-343 (holding that mandatory life sentence for 15-year-old for multiple first degree murders violated the proportionate penalties clause).

¶ 57    The State, on the other hand, encourages us to read *Moore*'s statement that "As *Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced in [the defendants'] proposed successive postconviction petitions" more broadly and without exception. *Moore*, 2023 IL 126461, ¶ 42.

¶ 58    The first district has adopted this latter interpretation in multiple other cases. For example, in *People v. Carter*, this court rejected the defendant's argument that he had established cause for his successive postconviction on the basis that his mandatory natural life sentence was distinguishable from the discretionary sentence in *Moore*. *People v. Carter*, 2023 IL App (1st) 220491-U, ¶¶ 20-21. There, we determined that the factual distinction between mandatory and discretionary sentences was irrelevant because a life sentence is a life sentence whether it is mandatory or discretionary and that *Miller*'s unavailability only deprived the defendant of "some helpful support." (Internal quotation marks omitted.) *Id.* ¶ 21.

¶ 59    Likewise, in *People v. Vega*, the defendant received a mandatory *de facto* life sentence and we found that the defendant could not establish cause for his successive postconviction petition because "in *Moore*, our supreme court made clear that *Miller* does not provide a young adult offender with cause to challenge his sentence in a successive postconviction petition under the proportionate penalties clause." *People v. Vega*, 2023 IL App (1st) 200663-UB, ¶¶ 14, 54; see *People v. French*, 2022 IL App (1st) 220122, ¶ 29 (holding the defendant failed to establish cause because *Dorsey*'s holding that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause" was not limited to juveniles (emphasis and internal quotation marks omitted)).

¶ 60    We cannot deny that there is inherent tension between the cases cited by defendant and the interpretation of *Moore* that *Miller* cannot provide cause for proportionate penalties challenges for young adults regardless of whether the life sentence is mandatory or discretionary. This interpretation has broad ramifications about what we expect of indigent defendants with no legal training when filing initial postconviction petitions. Defendant's initial postconviction petition in this case was filed in 2013, after *Miller* was decided but before *Thompson* and *Harris*. For defendant to properly plead the same claim then that is now in his successive petition requires a level of legal knowledge and expertise that veers into the improbable. Defendant would have had to examine and understand previous proportionate penalties arguments based on discretionary sentencing and prior claims about mandatory sentences that put forth different arguments like those in *Griffin* or *Leon Miller*. Then he had to synthesize a novel argument, using new and emerging science about brain development, that the proportionate penalties clause should extend the protections in *Miller* and the eighth amendment to young adults. In other words, he would have

had to predict *Thompson* and *Harris* in his initial postconviction petition to properly plead the same claim that now appears in his successive petition. This is something we do not even expect of attorneys in the context of ineffective assistance of counsel claims. See *People v. Chatman*, 357 Ill. App. 3d 695, 700 (2005) (requiring counsel to predict future appellate court holdings would render "effective assistance" an impossible standard).

¶ 61    This interpretation of *Dorsey*, *Clark*, *Moore*, and *Hilliard* also leaves defendant, like the defendant in *Vega*, in a proverbial no man's land. See *Vega*, 2023 IL App (1st) 200663-UB, ¶¶ 42-43. For those who committed first degree murder before they turned 21 and were sentenced after June 1, 2019, they may petition the Prisoner Review Board for parole after serving 20 years of their sentence. 730 ILCS 5/5-4.5-115(b) (West 2020). Defendant's proportionate penalties claim was raised too late, but he was also sentenced too early to benefit from the legislature's recent enactment that is derived from these very same principles about the culpability of emerging adults and evolving neuroscience about brain development. See *People v. Profit*, 2023 IL App (1st) 210881, ¶ 23 ("The enactment of [730 ILCS 5/5-4.5-115(b) (West 2020)] is a reflection of the recent Illinois jurisprudence deriving from *Miller v. Alabama* [citation], recognizing the potential for rehabilitation of juveniles and the evolving neuroscience showing that young adults (18 to 21 years old) may have similar brain development to those typically considered juveniles."). Defendant was also sentenced too late to earn the day-for-day good time credits that were eliminated when Illinois passed its truth-in-sentencing statute in 1998. See *Vega*, 2023 IL App (1st) 200663-UB, ¶ 43; 730 ILCS 5/3-6-3 (West 2010). Our own legislature has codified a recognition of *Miller*'s principles as they relate to emerging adults, and the Illinois cases which *expressly* opened the door to extend *Miller*'s principles to the proportionate penalties clause and

young adults did not exist when defendant filed his initial postconviction petition. So, it is concerning to conclude that defendant has no path to demonstrate his rehabilitative potential simply because of timing even though the fact-based portion of defendant's argument regarding brain development in young adults is a relatively new development.

¶ 62 Nevertheless, that is what we must do. We are bound by the supreme court's decisions regarding *Miller* as they relate to the proportionate penalties clause for young adults. *Dorsey*, *Clark*, *Moore*, and *Hilliard* all indicate that the claim at issue in this case should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along and that defendant did not need *Miller* or *Miller*-related proportionate penalties precedent to raise the claim now at issue. *Dorsey*, 2021 IL123010, ¶ 74; *Clark*, 2023 IL 127273, ¶¶ 92-93; *Moore*, 2023 IL 126461, ¶¶ 40-42; *Hilliard*, 2023 IL 128186, ¶ 28. Indeed, *Clark* and *Hilliard* reinforce this interpretation by clarifying that *Thompson* and *Harris* opened the door only wide enough to accommodate claims involving mandatory life sentences that were raised in initial postconviction petitions. *Clark*, 2023 IL 127273, ¶ 88; *Hilliard*, 2023 IL 128186, ¶ 27.

¶ 63 Defendant cannot establish cause for his failure to raise his proportionate penalties claim in his initial postconviction petition because a proportionate penalties clause claim was always available to him in some form. *Moore*, 2023 IL 126461, ¶¶ 40-42. As our supreme court has said, *Miller* was simply helpful support and not the basis for a new claim. *Clark*, 2023 IL 127273, ¶ 93. Having determined that defendant cannot establish cause, we need not determine whether he made the requisite showing of prejudice.

¶ 64 Accordingly, the trial court did not err in denying defendant leave to file a successive postconviction petition.

¶ 65                              III. CONCLUSION

¶ 66    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 67    Affirmed.

*People v. Horshaw*, 2024 IL App (1st) 182047-B

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 07-CR-25180; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Brian E. Koch, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Margaret M. Smith, Assistant State's Attorneys, of counsel), for the People. |