2025 IL App (1st) 231419-U

FIRST DIVISION
January 27, 2025

No. 1-23-1419

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 94 CR 22233 04 |
| TONY ROBINSON, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Mary Margaret Brosnahan, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   The circuit court's denial of the petitioner's *pro se* request for leave to file his third successive postconviction petition is affirmed, where the petitioner failed to establish cause for not raising his youth-based proportionate penalties challenge in an earlier proceeding.

¶ 2   The petitioner, Tony Robinson, appeals from the circuit court's denial of his *pro se* motion seeking leave to file his third successive postconviction petition pursuant to the Postconviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, the petitioner contends that he

sufficiently established cause and prejudice with respect to his proportionate penalties' challenge to his 100-year extended-term sentence, imposed for a crime he committed when he was only 22 years old (see Ill. Const. 1970, art I, § 11). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Because the record before us is voluminous as it spans over 30 years, we set forth only those facts and procedural history relevant to the resolution of the issues raised here. In 1994, together with three codefendants (Jamal White, Terrell Young, and Demetrius Jones) the petitioner was charged with first degree murder for his involvement in the August 19, 1994, shooting death of the nine-year-old victim, Joseph Orr. The petitioner was initially found unfit to stand trial and subject to involuntary admission after he displayed symptoms of "schizophrenic disorder" and serious "mood disorder." A year later, after a fitness restoration hearing, the petitioner was found fit for trial with the assistance of medication. The petitioner then proceeded with a jury trial[1] at which the following relevant evidence was adduced.

¶ 5     On August 19, 1994, together with several other children, the victim was playing in front of a makeshift club house, which was inside the basement of 4530 South Champlain Avenue, in Chicago. The area was controlled by two rival street gangs, the Gangster Disciples, who operated from the rowhouses on the corner of 45th Street and South Champlain Avenue, and the Black P Stones, who sold narcotics from a Chicago Housing Authority high-rise on 45th Street and Evans Avenue. That summer, the two street gangs were warring with each other and shootings on the block were common every week.

¶ 6     Melvin Irons testified that in the early afternoon hours of August 19, 1994, he spoke to a

---

[1] The petitioner's jury trial was held simultaneously with codefendant White's jury trial, but before separate juries. Codefendant White was found guilty of first-degree murder and sentenced to 50 years' imprisonment.

group of men in the parking lot of 4445 South Evans Avenue, whereupon he heard the petitioner state that he had been shot at the night before and was "probably going to do something at 45th [Street]" and "retaliate" and "start shooting back at them."

¶ 7    Around 3:50 p.m. that day, numerous witnesses heard gunshots in the area. Three eyewitnesses identified the petitioner as the shooter and a fourth observed the petitioner running from the scene with a gun in his hand. Specifically, Derrick Stroud, a member of the Gangster Disciples, testified that together with another friend and fellow gang-member, he was standing next to several younger children, including the victim, in front of the children's makeshift club house, when a maroon car with several men pulled up. Stroud saw the petitioner "hop" out of the vehicle, run up to them, and start shooting. The petitioner then backed up a little and began shooting again.

¶ 8    Two minors, Janieka Johnson and Konaa Bennett, similarly testified that they were walking by 4530 South Champlain Avenue when they heard gunshots and observed the petitioner running in their direction with a gun in his hand. The two girls ducked behind some parked vehicles and then watched as the petitioner fired more shots in the direction of the rowhouses where children were playing. Afterwards, Bennett observed the petitioner running back to the maroon car and jumping into the front passenger seat.

¶ 9    The fourth eyewitness, Angie Henderson, testified that she was inside her home at 4526 South Champlain Avenue when she heard about six gunshots. Henderson ran out onto her porch, which faced Champlain Avenue, and saw the petitioner running down the street with a gun in his hand. She then went downstairs and saw the nine-year-old victim lying on the ground.

¶ 10    A subsequent autopsy revealed that the victim was shot once through the back and died as a result of his injuries.

¶ 11    Evidence at trial further established that upon his arrest, the petitioner initially denied his participation in the shooting, but eventually gave a statement to the police implicating himself in the murder and identifying the murder weapon.[2] In his statement, however, the petitioner claimed that he had acted only as a "lookout" and that codefendant White was the shooter.

¶ 12    Specifically, the petitioner claimed that several days prior to the shooting, he and codefendant White were standing with a group of friends at 4445 South Evans Avenue, when they were shot at from the direction of the row houses controlled by the Gangster Disciples. The group ran back into their building whereupon codefendant White exclaimed that he was going to "kill them."

¶ 13    The petitioner acknowledged that he was a former member of the Black Disciples street gang[3] but was seeking to become a member of the Black P Stones because the Black Disciples had "jumped" on him "a while ago." On the morning of August 19, 1994, codefendant White told the petitioner that he was going to "take care of business," which the petitioner understood to mean that he was going to shoot at the Gangster Disciples in the row houses. Codefendant White wanted the petitioner to go "out there" and act as a "lookout." Before they left the building, a man named Raheem gave the petitioner a gun. The petitioner took the gun and passed it on to codefendant Jones outside of the building through a gate. Upon codefendant White's instructions, the petitioner then joined him and codefendant Young inside a car. The three of them then drove through an alley. The petitioner claimed that while inside the car, codefendant White pulled out a gun from under his seat and made sure it was loaded. Codefendant White was then dropped off near a church, while the petitioner and codefendant Young returned to the parking lot of their building. The

---

[2] Prior to trial, the petitioner unsuccessfully moved to have this statement suppressed on the basis that it was the product of police coercion and his unmedicated mental illness.

[3] Evidence at trial established that at that time, the Black Disciples were associates of the Gangster Disciples.

petitioner claimed that it was not until after they returned to that parking lot that he heard gunshots. He claimed that he did not shoot anyone and was not present for the shooting.

¶ 14    After the State rested, in his defense, the petitioner first presented the testimony of three eyewitnesses contradicting the State's identification of him as the shooter. Thelma Flemister, who was a minor at the time of the shooting, testified that she was sitting on a railing next to the children's makeshift club with her nine-year-old brother who was good friends with the victim. Thelma averred that contrary to his testimony at trial, Stroud was not standing near the children when the shooting began. While Thelma did not see who was shooting, she believed there to be more than one shooter and more than one gun.

¶ 15    Thelma's younger sister, Joy Flemister, similarly testified that on August 19, 1994, she was with the victim and several other children near their makeshift clubhouse when she observed the shooter jump from behind the bushes on Champlain Avenue and started firing in their direction. Joy, however, claimed that the petitioner was not the shooter, but rather a man whom she knew by the name "Tick."

¶ 16    Finally, Joy's and Thelma's mother, Willie Mae Flemister, testified that on the day of the incident she was standing near the back door of her house at 709 East 45th Street, when she heard gunshots from the direction of the clubhouse. A few minutes later, she observed "Tick," whom she knew by the first name "Melvin," running towards her home with a gun in his hand. Willie Mae testified that immediately after the shooting she attempted to speak with the police about what she had seen but that the police refused to listen to her when she tried to tell them about "Tick."

¶ 17    After the testimony of these three eyewitnesses, the petitioner called his mother, Alberta Robinson-Boyd, to testify about his learning difficulties and mental health issues. The petitioner's mother testified that the petitioner was always enrolled in school for slow learners. When he was

13 years old, the petitioner was stabbed in the head and beaten with a pipe, which slowed his mental capacity even more. The petitioner's mother also averred that in 1994, the petitioner was taking four different medications for his mental health issues, including Haldol, Cogentin, Thorazine, and Prozac.[4] He had been on these medications since 1988 but sometimes did not take them.

¶ 18    After the parties' closing arguments, the jury proceeded to deliberate. During its deliberations, the jury sent out two notes to the judge. The first note requested a partial transcript of Stroud's testimony. The circuit court told the jurors that the transcript was unavailable, that they had heard all the evidence and that they should continue to deliberate. The second jury note stated:

> "[D]ue to the evidence in this case we are uncomfortable with the choices provided for a
> decision of guilty for first degree murder. While we do feel beyond a reasonable doubt that
> [the petitioner] was <u>involved</u> in the death of [the victim], we would like it noted that we
> cannot conclude beyond a reasonable doubt that [the petitioner] was responsible for the
> shooting of [the victim.]" (Emphasis in original.)

The circuit court informed the jurors that they had been "instructed with regard to the law concerning responsible" (*i.e.*, the accountability instruction) and to continue to deliberate.

¶ 19    The jury subsequently found the petitioner guilty of first-degree murder.

¶ 20    At the sentencing hearing, the parties presented evidence in aggravation and mitigation. The State argued that the court should impose an extended term sentence because the victim was

---

[4] We take judicial notice of the fact that Haldol is an anti-psychotic, Cogentin aids in muscle control, Thorazine is a mood regulator, and Prozac is an antidepressant. See *e.g.*, *Kramer v. Ruiz*, 2021 IL App (5th) 200026, ¶ 32, n. 3 (citing *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37, 992 N.E.2d 125) (this court may take judicial notice of readily available facts that aid in the disposition of the issues on appeal); *People v Crawford*, 2013 IL App (1st) 100310, ¶ 118, n. 9 (this court may take judicial notice of information on a public website).

under 12-years-old[5] and this was a gang-related revenge killing during which the petitioner completely disregarded the presence of children on the scene. In addition, the State asserted that the petitioner had a long history of delinquency and escalating criminal activity, and that he was "rotten from the get-go." Relying on the presentence investigation report (PSI) the State pointed out that in 1983, the petitioner committed theft when he was only 11 years old (case No. 83 J 010419) for which he received continuance by supervision (Ill. Rev. Stat. 1983, ch. 37, par. 704-7). A year later, as a 12-year-old, the petitioner committed aggravated arson, for which he was given one year of probation (case No. 84 J 015270).[6]

¶ 21     According to the State, in 1988, the petitioner "graduated to the big time." That year, as a 16-year-old, the petitioner was charged as an adult with manufacture/delivery of a controlled substance, to which he pleaded guilty, in exchange for 2 years of felony probation (case No. 88 CR 1847). While on probation, however, in 1989, the petitioner committed two new offenses: theft (case No. 89 CR 25282) and residential burglary (case No. 89 CR 25974). The theft case involved a 37-year-old female victim, who was approached by the petitioner while she was seated on a CTA train. The petitioner grabbed her necklace and yanked it off her neck. In an attempt to prevent the petitioner from taking her necklace, the victim received scratches on her right hand but subsequently successfully chased the petitioner onto the platform. The petitioner pleaded guilty to both theft and residential burglary in exchange for a five-year prison term.

¶ 22     After being released from prison and while on parole, in 1992, the petitioner committed

---

[5] Because the victim was under 12 years old, the circuit court had the discretion to impose a sentence beyond the statutory range of 20 to 60 years' imprisonment for first degree murder (730 ILCS 5/5-8-1(a)(1)(a) (West 1994)), and instead impose an extended-term sentence, anywhere between 60 to 100 years' imprisonment (730 ILCS 5/5-8-2, 5/5-3.2(b)(4)(i) (West 1994)).
[6] The PSI notes that this probation was terminated satisfactorily.

yet another crime—robbery (case No. 92 CR 17226). The victim in that case was an 11-year-old paper boy who was accosted by the petitioner, on his morning paper route. The petitioner placed the victim in a headlock and threatened to kill him if he did not give him money, then pushed the victim to ground and took ten dollars from his shoe. The petitioner again pleaded guilty in exchange for four years imprisonment but was paroled after only two. While on parole, he committed the instant crime.

¶ 23    Under this record, the State argued that despite being given numerous opportunities for improvement, the petitioner chose to continue a life of crime, and therefore had no rehabilitative potential. According to the State, the court could not find "a more hardened criminal" deserving of a 100-year sentence.

¶ 24    In mitigation, defense counsel argued that the petitioner was not deserving of an extended term sentence because of his difficult childhood, mental health issues and his minor involvement in the crime. First, defense counsel asserted that the petitioner had acted only as a "lookout" during the shooting. Counsel pointed out that the note sent by the jury during its deliberations evinced that the jury had found the petitioner guilty under an accountability theory and not as the principal.

¶ 25    Next, counsel argued that while the petitioner admitted to having prior gang affiliations, he was essentially "a misfit in the wrong place at the wrong time." He was living in a Black P Stone area but was formerly a Black Disciple and was trying to fit in with a gang that really did not want him there.

¶ 26    Third, counsel argued that the petitioner was disadvantaged from the start because he had a very rough childhood and suffered from serious mental health issues. In support, counsel relied on the PSI and asked the court to admit into evidence the psychiatric evaluations completed while the petitioner was involuntarily committed for treatment before he was found fit to stand trial on

medication. According to these evaluations, the petitioner never knew his father and was raised by his grandmother because his mother was a heroin and cocaine addict and had served time in prison. The petitioner had problems concentrating in school, was hyperactive, and attended classes for slow learners, finishing only sixth grade. According to his mother, he could not read or write. In addition, at the age of 13, he was stabbed in the head and beaten with a pipe after which he lost consciousness and was hospitalized for two weeks. Since then, he has had even more cognitive problems.

¶ 27    The petitioner also had a long history of substance abuse. Because of his mother's addiction, he was exposed to alcohol and drugs at an early age and began consuming them when he was only 13 years old. He consumed about 80 to 120 ounces of beer per day, experiencing blackouts. He used heroin, cocaine, phencyclidine (PCP), and marijuana daily and was addicted to cocaine. In 1988, when he was 16-year-old, the petitioner was hospitalized in Tinley Park Hospital, secondary to a suicide attempt by hanging, which he attempted because he was depressed. While in hospital, he was treated with Haldol but stopped taking the drug after he was discharged.

¶ 28    Defense counsel argued that despite these impediments, the petitioner was now trying to better himself and was reading the Bible in jail. Counsel therefore sought a term-of-years sentence, so that the petitioner had some "hope" and an opportunity to change his life in the future.

¶ 29    In allocution, the petitioner asserted that he felt sorry for "what happened to the little boy" but that he "didn't do it."

¶ 30    The circuit court sentenced the petitioner to an extended term of 100-years imprisonment. In doing so, the court noted that it had considered all the factors in mitigation and aggravation and found that "none of the statutory factors in mitigation apply to this [petitioner.]" The court noted that it found "particularly aggravating" that the incident was gang related. As the court explained:

"And in this case as happens in so many cases, the victim is an innocent bystander of indiscriminate gang violence. In this case the victim was a nine-year-old boy who got shot and killed because this [petitioner], because of some perceived offense or slight against him by some rival gang or by his desire to be accepted into his new gang decided to start firing bullets into an area populated by children.

And while we know from the evidence that the intended victim in this shooting was a rival gang member, the real victim, the person standing next to the intended victim took the bullet. That was a nine-year-old boy who is no longer with us."

¶ 31     The circuit court specified that "from the evidence" it was clear to the court that the petitioner was the shooter and not just a "lookout" and that a lengthy sentence was necessary to deter others from committing the same crime.

¶ 32     In addition, the court found relevant that the petitioner had a substantial criminal history, and that this incident was his fifth felony conviction. The court explained that despite being given opportunities in the past either through short incarcerations or through probation to better himself and lead a fruitful life, the petitioner continued to resort to crime. The court therefore found that the petitioner was a danger to society and that "all hope" for him was "gone." As the court explained, the only hope that remained was sentencing the petitioner to a "period of incarceration long enough so that he is not released from the penitentiary until he is old and incapable of committing another crime."

¶ 33     On May 16, 1997, the petitioner filed a motion to reconsider and reduce his sentence, arguing that the circuit court had given "absolutely no consideration to [his] special circumstances." Specifically, the petitioner claimed that his sentence was unduly harsh because, among other things, he had a difficult childhood, "was not blessed with superior mental abilities,"

had the misfortune of a head injury that slowed his mental processes and suffered from mental illness.

¶ 34    After the circuit court denied that motion, the petitioner appealed his conviction and sentence. On direct appeal, he argued that: (1) the circuit court erred in admitting gang-related evidence and evidence of weapons, which were not connected to the shooting at his trial; (3) the circuit court erred in permitting the State to cross-examine defense witnesses on matters outside the scope of direct examination; and (3) the State impermissibly elicited testimony about the young age of the victim and made improper remarks in closing arguments, which inflamed the jury and affected the outcome of his trial. The petitioner further asserted that cumulatively these errors denied him his due process right to a fair trial. In addition, he argued that his mittimus incorrectly reflected more than one conviction. On August 6, 1999, we affirmed the petitioner's conviction and corrected the mittimus to reflect a single conviction for first-degree murder. See *People v. Robinson*, No. 1-97-2639 (unpublished order pursuant to Illinois Supreme Court Rule 23) (August 6, 1999), *pet. for leave to appeal denied*, 186 Ill. 2d 584 (1999) (*Robinson I*)).

¶ 35    On March 24, 2000, the petitioner filed a *pro se* postconviction petition alleging ineffective assistance of appellate counsel. On June 7, 2000, the circuit court summarily dismissed that petition, finding it to be frivolous and patently without merit. We affirmed that dismissal on March 8, 2002. See *People v. Robinson*, No. 1-00-2785 (unpublished order pursuant to Illinois Supreme Court Rule 23) (March 8, 2002), *pet. for leave to appeal denied*, 202 Ill. 2d 691 (2003) (*Robinson II*).

¶ 36    On December 19, 2005, the *pro se* petitioner filed his first successive postconviction petition, alleging several claims related to his fitness to stand trial with the assistance of medication. The circuit court denied the petitioner's request for leave to file his successive petition,

finding that the petitioner had failed to allege, let alone meet, the cause and prejudice test, which was a prerequisite to filing a successive petition. We affirmed the circuit court's decision on June 26, 2008. See *People v. Robinson*, No. 1-06-128 (unpublished order pursuant to Illinois Supreme Court Rule 23) (June 26, 2008) (*Robinson III*).

¶ 37    On March 10, 2010, the *pro se* petitioner sought leave to file his second successive postconviction petition, alleging that he was denied his due process rights because he was involuntarily medicated in order to attain fitness to stand trial. On March 17, 2010, the circuit court denied the petitioner's request finding that he failed to meet the cause and prejudiced test. After the petitioner appealed to this court, citing to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), the State Appellate Defender filed a motion seeking leave to withdraw as appellate counsel. On June 17, 2011, we granted the Appellate Defender's motion and affirmed the circuit court's denial of the petitioner's request for leave to file his second successive petition. *People v. Robinson*, No. 1-10-1108 (unpublished summary order pursuant to Illinois Supreme Court Rule 23(c)) (June 17, 2011) (*Robinson IV*).

¶ 38    On February 2, 2017, the petitioner filed a *pro se* section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2016)) asserting that his extended-term sentence was void because: (1) the victim's age was not charged in the indictment, pleaded to, nor proven beyond a reasonable doubt; (2) he was actually innocent; (3) the circuit court was precluded from sentencing him to an extended term sentence because the jury had found him guilty under accountability principles; (4) his *de facto* life sentence imposed on an immature young adult with a history of mental health issues was unconstitutional;[7] and (5) the statute under which he was sentenced was

---

[7] With respect to this claim, the petitioner alleged that pursuant to the decisions in *Miller v. Alabama*, 567 U.S. 460 (2012) and *People v. House*, 2015 IL App (1st) 110580, his 100-year *de facto* life sentence violated both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, Ill. § 11).

declared unconstitutional and never reenacted.[8]

¶ 39    On March 24, 2017, the circuit court denied the petitioner's section 2-1401 petition for relief from judgment and the petitioner appealed to this court. After the State Appellate Defender appointed to represent him filed a motion seeking to withdraw as counsel by citing to *Finley*, 481 U.S. 551, we granted that motion and affirmed the circuit court's denial of the petitioner's section 2-1401 petition for relief from judgment. See *People v. Robinson*, No. 1-17-1381 (unpublished order pursuant to Illinois Supreme Court Rule 23(c)) (May 22, 2019) (*Robinson V*).

¶ 40    On October 28, 2019, the petitioner filed the instant *pro se* motion for leave to file his third successive postconviction petition. Therein he alleged, *inter alia*, that his discretionary 100-year *de facto* life sentence violated both the eighth amendment (U.S. Const., amend VIII) and the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, Ill. § 11). The petitioner asserted that he had demonstrated cause for failing to raise this argument earlier because, *inter alia*, the scientific research establishing that young adult brains, such as his are more akin to juveniles than adults, was not available at the time he filed his first *pro se* postconviction petition. The petitioner argued that he had demonstrated prejudice because his youth was not considered at sentencing.

¶ 41    On February 16, 2023, the circuit court denied the petitioner's motion for leave to file his third successive postconviction petition. The circuit court held that the petitioner failed to establish cause and prejudice. The petitioner now appeals.

¶ 42                                      II. ANALYSIS

¶ 43    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a means by which criminal defendants may address substantial violations of their constitutional

---

[8] In *People v. Cervantes*, 189 Ill. 2d 80, 98 (1999), our supreme court declared void *ab initio* the so-called "Safe Neighborhoods Law" (Pub. Act., 88-680 (eff. Jan. 1, 1995)), one provision of which included the subsections regarding extended term sentencing under which the petitioner was sentenced.

rights at trial or at sentencing. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal, but rather, a collateral attack on a final judgment. *Id*. Accordingly, issues not presented in an original or amended petition will be deemed waived, and issues that have previously been raised and addressed on appeal will be barred pursuant to the doctrine of *res judicata*. *Id*.; see also *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing 725 ILCS 5/122-3 (West 2014)).

¶ 44    The procedural bars of waiver and *res judicata* can be overcome only where fundamental fairness so requires. *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). In proceedings under the Act, fundamental fairness is established by satisfying the requirements of the cause-and-prejudice test. See *People v. Clark*, 2023 IL 127273, ¶¶ 44-45.

¶ 45    Consistent with these principles, the Act contemplates the filing of only one petition without leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27; *Edwards*, 2012 IL 111711, ¶ 23; see also 725 ILCS 5/122-1(f) (West 2018). To obtain leave of court to file a successive postconviction petition, the petitioner must demonstrate cause for his failure to raise the claim in the initial petition and prejudice from that failure. *Id*. To show cause the petitioner must identify an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. *Id*.; see also *Pitsonbarger*, 205 Ill. 2d at 462. To show prejudice the petitioner must demonstrate that the claim not raised during his initial postconviction proceedings so infected the resulting conviction or sentence that it violated due process. *Id*. It is the petitioner's burden to make a *prima facie* showing of cause and prejudice before any further proceedings on his claim can occur. *People v. Bailey*, 2017 IL 121450, ¶ 24 (citing *People v. Smith*, 2014 IL 115946, ¶ 30). Failure to state either cause or prejudice will be detrimental to a motion seeking leave to file a successive petition. *Id*.

¶ 46    Accordingly, a motion for leave of court to file a successive petition will be denied "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Our review of the circuit court's denial of a motion for leave to file a successive postconviction petition is *de novo*. *Bailey*, 2017 IL 121450, ¶ 13.

¶ 47    In the present case, the petitioner contends that the circuit court erred in denying him leave to file his successive postconviction petition because he sufficiently established both cause and prejudice with respect to his claim that his discretionary 100-year *de facto* life sentence,[9] imposed for an offense that he committed when he was only 22 years old, without proper consideration of his youth, violated the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). The petitioner asserts that he made a *prima facie* showing of cause for his inability to raise this claim earlier because the neuroscientific research regarding the development of young adults over the age of 18 was unavailable to him at the time of his sentencing in 1997 and his initial postconviction petition in 2000 and began to be addressed only after the 2012 United States Supreme Court decision in *Miller v. Alabama*, 567 U.S. 460 (2012). The petitioner further asserts that he made a *prima facie* showing of prejudice because without this information the sentencing court had no opportunity to apply the emerging neuroscientific research to his particular circumstances. The petitioner argues that in context of this emerging research, his difficult upbringing, childhood trauma, drug abuse at an early age, and mental health issues, would have supported the conclusion that at the time he committed the offense, his brain was underdeveloped and more akin to a juvenile than an adult, and that therefore he was less culpable for his actions, such that the imposition of

---

[9] The parties do not dispute that the 100-year extended term sentence is a discretionary *de facto* life sentence.

the 100-year sentence violates the Illinois proportionate penalties clause.

¶ 48     We agree with the petitioner that if he were to be sentenced for the same crime today, his sentencing hearing would likely be very different. For one, the State certainly could not use the fact that he committed his first offense at the age of 11, and three of his remaining adult felony offenses before the age of 18, to argue that he was "rotten-from the get-go." Similarly, it is doubtful that a judge would find that "no mitigating factors" applied to the petitioner, considering the petitioner's seriously disadvantaged childhood, learning difficulties, substance abuse at an early age, traumatic head injury, and mental health issues.

¶ 49     Nonetheless, for the following reasons, and in light of our supreme court's most recent decisions in *People v. Dorsey*, 2021 IL 123010, *People v. Clark*, 2023 IL 127273, and *People v. Moore*, 2023 IL 126461, we are compelled to conclude that the petitioner cannot establish the requisite cause for failing to raise his proportionate penalties argument in an earlier proceeding so as to be able to succeed on his successive petition.

¶ 50     The proportionate penalties clause of our state constitution requires that all penalties "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause when, *inter alia*, the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of our community.' " *Clark*, 2023 IL 127273, ¶ 51 (quoting *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002)). Our supreme court has declined to define what constitutes a cruel or degrading sentence because "as our society evolves, so too do our concepts of elemental decency and fairness, which shape the 'moral sense' of the community." *Id.* (quoting *Leon Miller*, 202 Ill. 2d at 339).

¶ 51     The petitioner's present youth-based proportionate penalties claim originates with the

United States' Supreme Court decision in *Miller*, 567 U.S. 460, which held that in all but the rarest of circumstances where a crime reflects "irreparable corruption," the eighth amendment of the United States' Constitution (U.S. Const., amend VIII) prohibits the sentencing of juvenile offenders to mandatory life in prison without the possibility of parole. *Id*. at 479-80; see also *Montgomery v. Louisiana*, 577 U.S. 190, 206-11 (2016) (characterizing the decision in *Miller* as a new substantive constitutional rule that must be applied retroactively on state collateral review). In the aftermath of *Miller*, our supreme court broadened juvenile protection under the eighth amendment by extending *Miller*'s application beyond mandatory natural life sentences to *de facto* life sentences (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10) and by defining a *de facto* life sentence as a sentence of more than 40 years' imprisonment (*People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40-41).[10] In doing so, however, our supreme court repeatedly held that eighth amendment protections under *Miller* are limited to juveniles and do not apply to adults over the age of 18. See *People v. Harris*, 2018 IL 121932, ¶ 58.

¶ 52    Nonetheless, our supreme court showed a willingness to depart from this arbitrary age constraint, leaving open the possibility for young adult offenders to raise such claims under the Illinois proportionate penalties clause by relying on evolving neuroscientific research and societal norms. See *e.g.*, *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (holding that a 19-year-old defendant was "not necessarily foreclosed" from asserting an as-applied proportionate penalties challenge to his natural life sentence); *Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied, youth-based proportionate penalties challenge to his 76-year sentence

---

[10] Although our supreme court also initially held that *Miller* applied to discretionary life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40), it subsequently overruled that decision, concluding that it was at odds with the most recent United States Supreme Court precedent in *Jones v. Mississippi*, 593 U.S. 98, 104-105 (2021). See *People v. Wilson*, 2023 IL 127666, ¶ 42.

was "more appropriately raised" in a postconviction proceedings); see also *People v. House*, 2021 IL 125124, ¶¶ 29-31 (reaffirming that a young adult petitioner, 18 years or older, could make an as-applied challenge to his sentence under the proportionate penalties clause based on a developed evidentiary record as to how the "science concerning juvenile maturity and brain development applies equally to young adults, or to [the] petitioner specifically."). In doing so, our supreme court acknowledged the possibility that a young adult offender, such as the instant petitioner, could demonstrate through an adequate factual record that at the time he committed his crime, specific characteristics made him the functional equivalent of a juvenile, such that his *de facto* life sentence, imposed without the sentencing judge considering the safeguards established in *Miller*, violates the Illinois proportionate penalties clause because it is "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *Clark*, 2023 IL 127273, ¶ 51.

¶ 53     Despite this recognition, however, in the past two years, our supreme court has deliberately taken steps to narrow the availability of *Miller*-based proportionate penalties claims raised in successive postconviction petitions. See *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 51; *Dorsey*, 2021 IL 123010, ¶ 74; *Clark*, 2023 IL 127273, ¶¶ 24-26; *Moore*, 2023 IL 126461, ¶¶ 40-42.

¶ 54     First, in *Dorsey*, 2021 IL 123010, a 14-year-old juvenile offender sought leave to file a successive postconviction petition challenging the constitutionality of his 90-year *de facto* life sentence under the Illinois proportionate penalties clause. *Id*. The petitioner asserted that he could not have raised this claim earlier because *Miller* was decided long after he was sentenced and after he filed his original postconviction petition. *Id*. ¶ 23. Our supreme court disagreed and found that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide

cause for a [juvenile offender] to raise a claim under the proportionate penalties clause." *Id*. ¶ 74. Our supreme court reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing," and that *Miller*'s unavailability prior to 2012 at best deprived the petitioner of "some helpful support" for his state constitutional claim. (Internal quotation marks omitted.) *Id*.

¶ 55　Subsequently, in *Clark*, 2023 IL 127273, ¶¶ 24-26, our supreme court considered the same issue as applied to a 24-year-old young adult offender with intellectual disabilities. In finding that the petitioner failed to satisfy the cause prong of the cause-and-prejudice test, the court found that "the same reasoning applies" as in *Dorsey*, and that Illinois courts "were also aware that less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development." (Internal quotation marks omitted.). *Id*. ¶ 93. Our supreme court further held that "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders" and that therefore "the essential legal tools" to raise the proportionate penalties argument were available to the young adult offender in that case at the time he filed his initial petition. (Internal quotation marks omitted.) *Id*. ¶ 93.

¶ 56　In rejecting the petitioner's claim, our supreme court in *Clark* further explained that its prior decisions in *Thompson* and *Harris* opening the door for young adult offenders to raise *Miller*-based proportionate penalties challenges to their sentences, "addressed the possibility of *** a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *Id*. ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶ 44 and *Harris*, 2018 IL 121932, ¶ 48).

¶ 57　Shortly after *Clark*, in *Moore*, 2023 IL 126461, ¶¶ 12, 23, our supreme court reaffirmed

that young adult offenders cannot rely on the unavailability of *Miller* to establish the requisite cause for their failure to raise youth-based proportionate penalties challenges in their original postconviction proceedings. In affirming the circuit court's denial of two separate motions for leave to file successive petitions filed by two 19-year-old petitioners, our supreme court held that "[a]s *Miller* does not directly apply to young adults, it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id.* ¶ 42. The court further held that in that case, the evidence and arguments presented at the petitioners' sentencing hearings showed that the petitioners knew that "Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principes of the proportionate penalties clause." *Id.* Therefore, because "*Miller* did not change the law applicable to young adults, it [did] not provide cause for the proportionate penalties challenges" advanced by the petitioners' successive postconviction petitions. *Id.*

¶ 58 Under *Dorsey*, *Clark* and *Moore*, it is clear that a young adult offender, such as the petitioner in the instant case, who attempts to challenge his discretionary life sentence under the proportionate penalties clause, cannot rely on *Miller* and its progeny to establish the requisite cause to proceed with his claim. See *Dorsey*, 2021 IL 123010, ¶ 74; *Clark*, 2023 IL 127273, ¶¶ 24-26; *Moore*, 2023 IL 126461, ¶¶ 40-42.

¶ 59 In order to circumvent this obstacle, on appeal the petitioner asserts that he is not relying on the unavailability of *Miller* as the sole cause for his failure to raise his proportionate penalties claim earlier. Instead, he asserts that he is relying on *new evidence*, in the form of emerging neuroscientific research regarding the brains of young adult offenders, which became available only after the 2012 *Miller* decision. This evidence consists of numerous scientific articles, which discuss how the maturation of brain structure, function, and connectivity continues throughout an

individual's early twenties and how it impacts a young adult's thought process and potential for rehabilitation.[11] Notably none of these articles were in existence at the time of the petitioner's sentencing hearing (in 1997) or when he subsequently filed his initial postconviction petition (in 2000). The petitioner argues that without this scientific research he was without a *factual basis* upon which to raise his youth-based proportionate penalties' claim. Citing to *People v. Blalock*, 2022 IL 126682, he therefore asserts that he has sufficiently stated cause to proceed with this claim. For the following reasons, we disagree.

¶ 60     At the outset, we note that the scientific articles upon which the petitioner relies are not properly before this court because they were not attached to his successive postconviction petition.

---

[11] See Center for Law Brain & Behavior at Massachusetts General Hospital, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers,* https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ (last accessed May 7, 2024) ("White Paper") (citing Leah Somerville, *Searching for Signatures of Brain Maturity: What are We Searching For?* 92 Neuron 1164, 1164-67 (2016); Alexandra O. Cohen et al., *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Non-emotional Contexts*, 27 Psych. Sci. 549 (2016); March D. Rudolph et al., *At Risk of Being Risky: The Relationship Between 'Brain Age' Under Emotional States and Risk Preference*, 24 Developmental Cognitive. Neurosci. 93, 93-106 (2017); B. J. Casey et al., *Development of the Emotional Brain*, 29 Neurosci. Letters 693 (2019); Laurence Steinberg, *Adolescent Brain Science and Juvenile Justice Policymaking*, 23 Psych. Pub. Pol'y & L. 419 (2017); Teena Willoughby et al., *Examining the Link Between Adolescent Brain Development and Risk-Taking From a Social-Developmental Perspective*, 89 Brain & Cognition 70 (2014); Jennifer Silvers et al., *vIPFC-vmPFC-amygdala Interactions Underlie Age-Related Differences in Cognitive Regulation of Emotion*, 27 Cerebral Cortex 3502 (2017); B. J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent Behavior*, 66 Ann. Rev. Psych. 295 (2015); B. J. Casey et al., *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, 5 Ann. Rev. Criminology 321 (2022); Laurence Steinberg et al., *Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation*, 21 Developmental Sci. 10.1111 (2018); Surjeet Mastwal et al., *Phasic Dopamine Neuron Activity Elicits Unique Mesofrontal Plasticity in Adolescence*, 34 J. Neuroscience 9484 (2014); Vishnu Murty, Finnegan Calabro & Beatriz Luna, *The Role of Experience in Adolescent Cognitive Development: Integration of Executive, Memory, and Mesolimbic Systems,* 70 Neurosci. & Biobehavioral Rev. 46 (2016); Catherine Insel et al., *Development of Corticostriatal Connectivity Constrains Goal-Directed Behavior During Adolescence*, 8 Nature Comm. 1 (2017); Juliet Davidow, Catherine Insel & Leah Somerville, *Adolescent Development of Value-Guided Goal Pursuit,* 22 Trends Cognitive Sci. 725 (2018); Arielle Baskin-Sommers et al., *Towards Targeted Interventions: Examining the Science Behind Interventions for Youth Who Offend,* 5 Ann. Rev. Criminology 345 (2022); Off. Juv. Just. Delinq. Prot., *Law Enforcement & Juvenile Crime: Arrests by Offense, Age, and Gender*, U.S. Dept. Just. (Oct. 21, 2019), https://www.ojjdp.gov/ ojstatbb/crime/ucr.asp?table in=)).

See 725 ILCS 5/122-2 (West 2018) ("The [postconviction] petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached.") In alleging cause, the motion for leave to file and the attached successive postconviction petition only referenced the unavailability of *Miller*, *House*, and new "brain science" research about young adults.

¶ 61    Regardless, even if we accept the petitioner's request to take judicial notice of and consider these scientific articles, we nonetheless find that the petitioner has failed to make a *prima facie* showing of cause for his failure to raise this claim in an earlier proceeding.

¶ 62    In that respect, we disagree with the petitioner's argument that his case is analogous to *Blalock*, 2022 IL 126682. *Blalock* involved an allegation of police coercion alleged in a successive postconviction petition. *Id*. ¶ 39. In that case, the petitioner contended that he satisfied cause for failing to argue that his confession had been coerced because he could not have discovered evidence of a "pattern and practice of police brutality" before his initial postconviction petition. *Id*. ¶ 40. The State, on the other hand, asserted that the petitioner was not precluded from raising this claim earlier because he must have known of his own abuse at the hands of the police at the time when it occurred. *Id*. In agreeing with the petitioner, our supreme court held that cause is satisfied by "a showing that the factual or legal basis for a claim was not reasonably available to [defense] counsel." (Internal quotation marks omitted.) *Id*. In doing so, our supreme court emphasized that "evidence of a pattern and practice of police misconduct is part of the factual basis of a coerced confession claim ***." *Id*. ¶ 45. Thus, corroborating evidence "external to the defense," is necessary to effectively raise a claim of police misconduct. (Internal quotation marks omitted.) *Id*. ¶ 44. Furthermore, the court noted that the insidious nature of police abuse makes gathering this type of evidence particularly difficult. *Id*. (quoting *People v. Brandon*, 2021 IL App

(1st) 172411, ¶ 57) ("This evidence pertains to the conduct of the State's own agents, toward unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question *** have every incentive to remain mum, if not deny everything."). Accordingly, without corroborating evidence, a petitioner is impeded from even raising his coerced confession claim. *Id*.

¶ 63    In contrast, such concerns are absent in a sentencing challenge based on the petitioner's age. See *People v. Searles*, 2024 IL App (1st) 210043-U, ¶ 17. "The factual basis for such a challenge is that fully developed adults are different from young adults who are still developing." *Id*. (citing *Leon Miller*, 202 Ill. 2d 328). This distinction is a fact that Illinois courts have long recognized. See *e.g*., *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47 ("decades before *Harris*, Illinois case law held that the proportionate-penalties clause required the sentencing court to take into account the defendant's 'youth' and 'mentality' "; noting that in *People v. Maldonado*, 240 Ill. App. 3d 470 485-86 (1992) the appellate court reduced the sentence of a 20-year-old offender and that in *People v. Center*, 198 Ill. App. 3d 1025, 1034 (1990), it did the same for a 23-year-old); see also *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894) ("There is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those who are minors" between "the ages of 16 and 21 years;" "the habits and characters of the latter are presumably, to a large extent, as yet unformed and unsettled."). Accordingly, unlike in *Blalock*, the petitioner here did not need any "external" corroborating evidence (*i.e*., the new neuroscientific research) before he could raise his proportionate penalties' claim. See *Dorsey*, 2021 IL 123010, ¶ 73. Instead, the petitioner had "the essential legal tools" necessary to make that argument in an earlier proceeding. *Moore*, 2023 IL 126461, ¶ 42; *Clark*, 2023 IL 127273, ¶ 93; *Dorsey*, 2021 IL 123010, ¶ 73. Accordingly, since he

cannot establish the requisite cause, the petitioner is barred from raising this claim in his third successive postconviction petition.

¶ 64    In coming to this conclusion, we are not indifferent to the petitioner's predicament and recognize that even though the neuroscientific research regarding brain development of young adults is relatively new, he has no meaningful path to demonstrate his rehabilitative potential that would permit his release from prison before his 70th birthday.[12] Nonetheless, "we are bound by our supreme court's decisions regarding age-based proportionate penalties challenges for young adults." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62. *Dorsey*, *Clark* and *Moore* all instruct that the claim at issue here "should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *Dorsey*, 2021 IL 123010, ¶ 74, *Clark*, 2023 IL 127273, ¶¶ 92-93 and *Moore*, 2023 IL 12646, ¶¶ 40-42). Indeed, *Clark* reinforces this interpretation by clarifying that *Thompson* and *Harris* opened the door only wide enough to accommodate *Miller*-based proportionate penalties claims that involve mandatory life sentences that were raised in initial postconviction petitions. *Clark*, 2023 IL 127273, ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶ 44 and *Harris*, 2018 IL 121932, ¶ 48); see also *People v. Hilliard*, 2023 IL 128186, ¶ 27 (repeating this narrow view and adding that the *Miller*-based proportionate penalties challenge in *House*, 2021 IL 125124, ¶ 5 also involved both a mandatory life sentence and an initial postconviction petition.)

¶ 65    As such, the petitioner here cannot establish cause for failing to challenge the

---

[12] Because the petitioner was sentenced in 1997 "before the truth-in-sentencing statute was *validly* enacted" he is eligible for day-for-day good conduct credit and could therefore serve only 50 years of his 100-year sentence. (Emphasis in original.) *Dorsey*, 2021 IL 123010, ¶ 50. The Illinois Department of Corrections (IDOC) website, of which we may take judicial notice, currently lists the petitioner's projected discharge date as April 12, 2045, and his projected parole date as April 11, 2042. See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29 (noting that this court may take judicial notice of information appearing on the IDOC website).

constitutionality of his sentence in his original postconviction petition because "a proportionate penalties claim was always available to him in some form." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *Moore*, 2023 IL 12646, ¶¶ 40-42).

¶ 66   Since we find that the petitioner has failed to establish cause, we need not determine whether he made the requisite showing of prejudice.

¶ 67                              III. CONCLUSION

¶ 68   For these reasons, we affirm the circuit court's denial of the petitioner's request for leave to file his third successive postconviction petition.

¶ 69   Affirmed.